IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2021 Session

### IN RE **PORCALYN N.**

**Appeal from the Juvenile Court for Knox County**
**No. 171950   Timothy E. Irwin, Judge**

_____

#### No. E2020-01501-COA-R3-PT
_____

Thomas N. ("Father") appeals the order of the Juvenile Court for Knox County ("trial court") terminating his parental rights to his minor child, Porcalyn N. (the "Child").[1] Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

KRISTI M. DAVIS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Thomas N.

Herbert H. Slatery III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I. BACKGROUND

The Tennessee Department of Children's Services ("DCS") first became involved with the Child, Father, and the Child's biological mother ("Mother")[2] on March 13, 2019, after receiving a referral that the Child was exposed to drugs and pervasive domestic violence in the home. Specifically, the referral alleged that on March 13, 2019, there was a drunken altercation between Mother and Father while the Child was in the home which resulted in Mother being arrested for domestic assault. DCS then received a second referral

---

[1] In actions involving a juvenile, it is this Court's policy to protect the privacy of the child by using only the first name and last initial, or only the initials, of the parties involved.

[2] Although her involvement is pertinent, Mother's parental rights are not at issue in this appeal.

on or about April 5, 2019, alleging that Mother and Father had another altercation with a neighbor, after which Father was arrested. The trial court issued a bench order on April 5, 2019, temporarily placing the Child in DCS custody and setting a preliminary hearing for April 9, 2019. DCS filed a petition to adjudicate the Child dependent and neglected on April 8, 2019, and the trial court heard this petition on June 19, 2019 and July 23, 2019. On July 23, 2019, the trial court entered an order finding that the Child was dependent and neglected in Father's care based upon the drug abuse, domestic violence, and criminal activity within the home.[3]

DCS developed the first permanency plan for Father on April 26, 2019. Father participated in the creation of this plan, which was ratified on June 23, 2019. Father's requirements under the plan, broadly, were to: (1) undergo an alcohol and drug assessment and complete any follow-up recommendations; (2) submit to drug screens; (3) complete an anger management course; (4) complete a domestic violence education course; (5) obtain a mental health assessment; (6) complete parenting classes; (7) maintain a stable, drug-free home and a legal source of income; (8) attend regular supervised visitation with the Child; (9) pay child support; and (10) refrain from incurring any additional criminal charges. October 26, 2019 was the target completion date for the permanency plan requirements; however, a new plan was created on October 15, 2019 because it was apparent the first target date could not be reached. The second plan contained largely the same requirements as the first plan, and the target completion date was extended to April 15, 2020.

Father completed some of the permanency plan requirements but, overall, struggled to make meaningful progress. Father completed the alcohol and drug assessment, and his follow-up recommendations were to participate in intensive outpatient treatment to further address his trauma issues and substance abuse. Although Father completed intensive outpatient treatment by September 2019, Father tested positive for Suboxone throughout the program. Father reported to his DCS case worker, Sharee Shaw ("Ms. Shaw"), that he did not have a prescription for Suboxone and purchased it off the street. During September 2019, Father was given drug screens four times and tested positive for Suboxone each time. In October 2019, Father was asked to submit to a hair follicle test and refused.

Father did not attend parenting classes, domestic violence classes, or an anger management program. Additionally, while Father attended some supervised visitation with the Child at first, it is undisputed that Father stopped attending visitation altogether after October 2019. When Father did visit the Child, however, those visits went well. Nonetheless, the issues between Mother and Father continued into the fall of 2019, and Father was arrested several more times. Ms. Shaw visited Mother's and Father's home on October 28, 2019 and observed a hypodermic needle and a spoon on a nightstand. There were also liquor bottles strewn about the home. Although Mother informed Ms. Shaw at the time of the visit that the drug paraphernalia belonged to Father, Father has always

---

[3] Mother stipulated that the Child was dependent and neglected.

maintained that it was Mother's. Regarding child support, Father made three payments of $47.30 throughout the Child's custodial period, totaling $141.90. These payments were made in November and December of 2019.

DCS eventually filed a petition to terminate Father's parental rights in the trial court on January 9, 2020. The alleged grounds for termination were abandonment by failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest a willingness and ability to assume custody of the Child. A trial was held on July 23, 2020, at which the trial court heard testimony from Ms. Shaw, Father, and the Child's foster mother, Carla M.

Ms. Shaw explained that the primary issues underpinning the Child's removal were the ongoing substance abuse and domestic violence in Father's home. Ms. Shaw initially stated that although the Child was originally removed from an apartment leased in Father's name, Father was not residing in the apartment the particular day the Child was removed due to a no-contact order between Mother and Father. However, Ms. Shaw later testified that there was an altercation between Mother, Father, and a neighbor on or about April 5, 2019 at the apartment, after which Father was arrested. Consequently, Ms. Shaw's testimony regarding Father's involvement on the day of removal was not altogether clear.

Regarding Father's participation in the permanency plan, Ms. Shaw's testimony showed that Father completed some requirements of the plan between April 2019 and October 2019, but that his participation was inconsistent and that he eventually stopped visiting the Child. Although Ms. Shaw recognized that Father completed his intensive outpatient treatment, she also recalled that Father tested positive for Suboxone on July 25, 2019, August 1, 2019, August 5, 2019, August 22, 2019, August 26, 2019, as well as on four occasions in September 2019. Father also refused several drug screens and received "administrative fails" for those tests. At one point, Father also refused a hair follicle test that was requested by the Child's guardian ad litem.

Ms. Shaw expressed particular concern regarding the ongoing domestic violence between Mother and Father, which continued throughout the Child's custodial period. Specifically, Ms. Shaw testified that Father was arrested on October 24, 2019, November 22, 2019, January 11, 2020, May 13, 2020, and May 23, 2020. Father's arrest on May 23, 2020 resulted in charges for kidnapping, aggravated assault, and coercion of a witness based on yet another altercation between Mother and Father. As to Father's child support payments, Ms. Shaw stated that Father reported to her in September 2019 that he was employed as a handyman but that Father never provided Ms. Shaw with any pay stubs or other verification of employment. Despite having been ordered to pay $205.00 per month in child support, Father had paid a total of $141.90 in child support by the time of trial. Overall, Ms. Shaw's position was that Father had essentially ceased involvement in the Child's life, had not completed the most important aspects of the permanency plan, and still struggled with the primary issues that caused the Child's removal. Ms. Shaw testified

that the Child was happy and stable in her current foster home and that the foster family wished to adopt the Child. The Child's foster mother, Carla M., confirmed this testimony.

Father's proof consisted only of his own brief testimony. As Father recalled, he had not been living with Mother and the Child for several weeks prior to the Child's removal due to a no-contact order involving Mother, himself, and Father's mother. Father claimed that this order arose out of an attack by Mother on Father and his mother. In fact, Father maintained at trial that most if not all of the family's problems stemmed from Mother's behavior and substance abuse. Nonetheless, during the custodial period, Father and Mother continued their relationship, and Father confirmed that his most recent criminal charges were the result of an incident with Mother. Father denied that he was still abusing drugs, testifying that the last time he used any substances was in January of 2020, when he "slipped up" and used methamphetamine. When asked about ceasing his visitation with the Child, Father testified that he was leery of DCS and afraid that if he appeared for visitation, he would be arrested. Father offered no explanation as to why he failed to pay the ordered child support other than on a few occasions. By his own testimony, Father was employed during the custodial period and did not need assistance from DCS regarding housing or job placement. Father claimed that the drug paraphernalia found by Ms. Shaw on October 28, 2019 could not have been Father's because he was at work that day. By the time of trial, Father had pled guilty to two counts of aggravated assault pertaining to the most recent incident with Mother but expected that he might be out of jail by August 2020 and would need a year or maybe less before he could assume custody of the Child. Father maintained, however, that he was planning on separating from Mother for good and staying clean and that he loves the Child.

The trial court found that DCS proved all five grounds for termination by clear and convincing evidence and that termination was in the Child's best interest. The final order was entered on October 1, 2020, and Father timely appealed to this Court.

## II. ISSUES

Father raises the following issues on appeal, which we restate and consolidate as follows:

1. Whether the trial court erred in concluding that DCS proved all of the alleged grounds for termination by clear and convincing evidence.

2. Whether the trial court erred in concluding that DCS proved by clear and convincing evidence that termination of Father's parental rights is in the best interests of the Child.

- 4 -

Our Supreme Court has explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the

evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

## IV. DISCUSSION

### 1. Grounds for Termination

#### a. Abandonment – Failure to Support

Parental rights can be terminated for abandonment, as that term is defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). One form of abandonment is failure to support, which occurs when a parent, "for a period of four (4) consecutive months, [fails] to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Support is considered "token" when "the support, under the circumstances of the individual case, is insignificant given the parent's means." *Id.* § 36-1-102(1)(B). An adult parent is presumed to know that he or she has a duty to provide support. *Id.* § 36-1-102(1)(H); *In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017). A parent may assert, as an affirmative defense, that the failure to provide financial support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). However, the parent bears "'the burden of proof that the failure to . . . support was not willful' and must establish the lack of willfulness by a preponderance of the evidence." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *8 (Tenn. Ct. App. July 22, 2020) (quoting Tenn. Code Ann. § 36-1-102(1)(I)).

Here, DCS filed its petition for termination on January 9, 2020. Consequently, the pertinent four-month period is September 8, 2019 through January 8, 2020.[4] *See In re*

---

[4] Father was arrested twice during the relevant four-month statutory period, but Ms. Shaw testified

*Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014) ("[T]he applicable four month window for determining whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed."). As a threshold argument, Father asserts that the trial court applied an incorrect four-month statutory period in this case. This argument arises from the trial court's oral ruling made on July 23, 2020 directly after trial:

> The Court finds that [F]ather did make an income for a sufficient amount of time where it would have been possible for him to pay child support, that in all the months the [C]hild was in custody, from April of 2019, that he only paid $141. That's willful failure to pay child support. [Father] was in jail part of that time, but there's plenty of four-month periods that he wasn't in jail. There's like three different ones in the 15 months that he wasn't in jail.

We agree with Father that the trial court's oral statement does not clearly reflect the correct statutory four-month period. *See* Tenn. Code Ann. § 36-1-106(1)(A)(i); *In re Jacob C.H.*, 2014 WL 689085, at \*6. Nonetheless, in the trial court's final order entered October 1, 2020, the trial court found that "Father abandoned the [C]hild because he willfully failed to support the [C]hild in the four months right before the petition was filed." Accordingly, the trial court ultimately applied the correct statutory period, and we are unpersuaded that the trial court's July 23, 2020 statement amounts to reversible error. Moreover, even when a trial court applies an incorrect four-month statutory period, it is considered harmless error if "the trial court's findings of fact and conclusions of law include sufficient information to consider the correct four-month period." *In re Braelyn S.*, 2020 WL 4200088, at \*5 (citing *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at \*9 (Tenn. Ct. App. Jan. 31, 2019)). The trial court in this case made detailed findings of fact and conclusions of law, which provide that Father made three payments during the salient time period and that those payments totaled $141.90. The trial court also found that Father reported to DCS that he was employed as a handyman, earned up to $18.00 per hour, and worked forty hours per week. Accordingly, even if the trial court applied an incorrect statutory four-month period, the trial court's findings of fact and conclusions of law provide a sufficient basis for us to consider the correct period in our *de novo* review. *Id.*

---

that Father was released the same day on both occasions. Father did not dispute this testimony at trial nor has he argued that Tenn. Code Ann. § 36-1-102(1)(A)(iv), rather than § 36-1-102(1)(A)(i), applies here. Further, we have previously held that a brief incarceration "resulting solely from [] arrest and not any court-imposed sentence of incarceration" does not bring a parent "within the class of 'incarcerated or recently incarcerated parents to which Tenn. Code Ann. § 36-1-102(1)(A)(iv) applies.'" *In re Kaitlin W.*, No. E2015-01553-COA-R3-PT, 2016 WL 2931326, at \*8 (Tenn. Ct. App. May 16, 2016) (quoting *In re: Courtney N.*, No. E2012-01642-COA-R3-PT, 2013 WL 2395003, at \*7 (Tenn. Ct. App. May 31, 2013)). Therefore, Father's arrests do not affect the statutorily determinative period in this case.

Turning to the merits of this ground, we agree with the trial court that clear and convincing evidence shows Father abandoned the Child through failure to support. Father did not dispute at trial that he was ordered to pay $205.00 per month in child support but paid only $141.90 during the relevant four-month period. While Father could have asserted lack of willfulness as an affirmative defense at trial, he did not do so; indeed, Father never discussed child support during his testimony. However, Father testified that he had housing, a job, and a vehicle throughout the custodial period and offered no explanation as to why he was unable to provide further support to the Child. Additionally, Father purchased Suboxone off the street and used methamphetamine during the salient four-month period; accordingly, Father's own testimony reflects that he had some disposable income during the relevant period, and at no point during his testimony did Father claim that he could not afford the full child support payment.

Under these circumstances, the total contribution of $141.90 is "insignificant given the parent's means[,]" and we conclude that the support paid by Father was token. Tenn. Code Ann. § 36-1-102(1)(B); *see also In re Alleigh B.*, No. M2020-00116-COA-R3-PT, 2021 WL 1626340, at *4 (Tenn. Ct. App. Apr. 27, 2021) (concluding that $50.00 per month payments were token in light of mother's admissions that she was gainfully employed during four-month statutory period and that she had minimal expenses at the time); *In re Hayden F.*, No. E2020-00872-COA-R3-PT, 2021 WL 1117028, at *8 (Tenn. Ct. App. Mar. 24, 2021) ("Mother was admittedly aware of her duty to support her [c]hildren and the record shows that she had the ability to pay some support. In this case, the testimony exposes [m]other's choice to prioritize other expenditures, including the purchase of marijuana, instead of financially supporting the [c]hildren."); *In re Kayden A.*, No. W2020-00650-COA-R3-PT, 2021 WL 408860, at *7 (Tenn. Ct. App. Feb. 5, 2021) (single attempt to pay child support and gifts for child amounted to token support where mother admittedly worked during the four-month period, had few expenses, and offered no other reason why she was unable to pay the ordered support).

Accordingly, the trial court correctly concluded that DCS proved by clear and convincing evidence that Father's parental rights should be terminated for abandonment through failure to support the Child.

### b. Abandonment – Failure to Provide a Suitable Home

Parental rights may also be terminated for abandonment through failure to provide a suitable home. Tenn. Code Ann. § 36-1-113(g)(1); § 36-1-102(1)(A)(ii). This form of abandonment occurs when:

> (*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child

was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

*Id.* § 36-1-102(1)(A)(ii)(a)–(c).

This ground "considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. The Department should utilize its superior resources in assisting a parent to establish a suitable

home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (citing *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)); *see also In re Matthew T.*, 2016 WL 1621076, at *7. Although the parent is required to make "reasonable efforts" to establish a suitable home, "successful results" are not required, and the "statute requires that the parent also have demonstrated a lack of concern for the [child]." *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006).

In this case, the trial court found that Father's parental rights should be terminated based on his failure to provide a suitable home for the Child because Father "continues to use drugs and alcohol, and keeps going back to the mother of the [C]hild." The trial court further found that "Father continues to buy Suboxone off the street" and that "Father has demonstrated a lack of concern for the [C]hild to such a degree that it appears unlikely that he will be able to provide a suitable home for the [C]hild at an early date."

We agree with the trial court that DCS proved this ground by clear and convincing evidence. The Child was removed from Father's custody by DCS and adjudicated dependent and neglected. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a). Further, the trial court found, on April 5, 2019, that it was "reasonable to make no effort to maintain the child in the home." *Id.* § 36-1-102(1)(A)(ii)(b). Moreover, the record does not preponderate against the trial court's factual findings regarding the ongoing risks within Father's home. While the primary problems necessitating the Child's removal were Father's and Mother's substance abuse and their violent relationship, Father's efforts to address these issues were perfunctory at best.

On appeal, Father asserts that DCS made no "efforts related to housing during any period of time." This argument is unavailing, however, because the record does not show that Father has ever struggled to maintain housing. Father testified at trial that he and Mother moved to a duplex around May 2019 and lived there until February 2020. Father also testified that he had a working vehicle and a job during the custodial period, and there was no testimony that Father had difficulty paying rent or utilities. In fact, when specifically asked whether he needed help with "budgeting or housing or income[,]" Father responded "not really[,] I had . . . a house, a car, a job." Consequently, the fact that DCS never assisted Father with housing is inapposite in this particular case. Father's argument ignores the well-settled principle that a suitable home requires "'more than a proper physical living location[,]'" *In re Daniel B.*, 2020 WL 3955703, at *4 (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, 2007 WL 4207941, at *3), and that a suitable home should "be free of drugs and domestic violence," *In re Hannah H.*, 2014 WL 2587397, at *9.

The problem in this case was never lack of physical housing, but rather the fact that Father's home is far from being "free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9. Rather, Father continued to illegally purchase Suboxone while

the Child was in DCS custody and testified to using methamphetamine the same month the petition for termination was filed. Father also testified that the hypodermic needle found by Ms. Shaw during the home visit in October 2019 was Mother's, yet Father continued to allow Mother to live in his home. Although Father testified that Mother uses drugs daily, is a poor influence on him, and that he could get the Child back if he separated from Mother, Father is either unwilling or unable to disentangle himself from Mother. Inasmuch as Father knows of Mother's daily drug abuse in the home and simply refuses to do anything about it, Father has not established a suitable home for the Child. Domestic violence also remains an issue for Mother and Father, as Father was incarcerated at the time of trial based on an incident with Mother.

The record also reflects that DCS made reasonable efforts to assist Father in remedying these issues. Ms. Shaw testified that she tried to arrange Father's domestic violence classes, offered Father rides, and offered to help baby-proof Father's home but that these offers were refused. Additionally, DCS paid for Father's alcohol and drug assessment and intensive outpatient treatment. Ms. Shaw also testified that Father failed to remain in contact with her throughout the pendency of this case. Seeing as Father ceased contact with Ms. Shaw and visitation with the Child, it is unclear how DCS could have further assisted Father.

Because the Child would almost certainly be exposed to substance abuse and domestic violence in Father's home, we cannot conclude that Father established or made reasonable efforts to establish a suitable home for the Child. Despite reasonable efforts by DCS, Father has not taken the necessary steps to provide a suitable home for the Child. We therefore conclude that clear and convincing evidence supports termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(1) and Tennessee Code Annotated section 36-1-102(1)(A)(ii).

### c. Substantial Noncompliance

Tennessee Code Annotated section 36-1-113(g) provides that parental rights may also be terminated on the ground of "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground cannot be established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *accord* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . . if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue *de novo*. *See In re Valentine*, 79 S.W.3d at 547.

Here, the trial court made the following pertinent findings as to this ground:

> The Court concludes that Father did not substantially comply with the reasonable responsibilities of the permanency plans. Father knew the consequences of his failure to accomplish the tasks on the plan as evidenced by his attendance at Court during the ratification of the plan where it was explained and as evidenced by his signing of the plans. Father failed to comply with the recommendations of his assessments, did not visit regularly, and has not been a law-abiding citizen.

The record does not preponderate against the trial court's factual findings. The Child was initially removed from Mother's and Father's custody primarily due to pervasive domestic violence in the home and exposure to drugs, and because the permanency plans were clearly geared towards addressing these issues, we agree that the requirements of the plan were reasonable and related to the issues necessitating the Child's placement in foster care. Father did not complete domestic violence classes and incurred new criminal charges stemming from his relationship with Mother. Perhaps the most significant example of noncompliance was Father's status at the time of trial, having just pled guilty to two counts of aggravated assault against Mother. Father also substantially failed to comply with the portions of the plan addressing substance abuse. Ms. Shaw observed a hypodermic needle with a spoon and empty liquor bottles in Father's home on October 28, 2019, and Father testified that he used methamphetamine in January of 2020. While Father did complete his intensive outpatient treatment, his substance abuse issues were largely the same, if not worse, by the time of trial. Father also ceased all visitation with the Child after October 2019, in contravention of the plan's requirements.

In light of the importance of the requirements that Father failed to meet, we conclude that his noncompliance with the permanency plan was substantial. Accordingly, clear and

convincing evidence supports the trial court's conclusion that Father's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

### d. Persistent Conditions

Tennessee Code Annotated section 36-1-113(g) provides that a person's parental rights can be terminated when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.
>
> Tenn. Code Ann. § 36-1-113(g)(3)(A).

The purpose of the persistent conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016). Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (citing *In re T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)). Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

In the instant case, the trial court found that the primary conditions underpinning the Child's removal from Father's custody were drug use and, broadly, illegal activity within the home. The trial court also found that these issues persisted at the time of trial

- 13 -

because Father "continue[d] to use drugs, failed to participate in treatment, and continues to participate in illegal activity." While the record preponderates in favor of the trial court's findings that Father continues to abuse drugs and incur new criminal charges, the record preponderates against the finding that Father failed to participate in any treatment. It is undisputed that Father completed an alcohol and drug assessment, passed some drug screens, and eventually completed an intensive outpatient treatment program. Nonetheless, our own review of the record leads us to conclude that clear and convincing evidence supports termination for persistent conditions because the most significant problems necessitating the Child's removal were still prevalent by the time of trial. Chief among these problems, as we have discussed at length, is the pattern of domestic violence between Father and Mother. Not only did Father not participate in the required domestic violence or parenting classes, but Father at several points in his testimony blamed Mother for the violence in their relationship. Father's refusal to take any responsibility for this issue suggests Father is likely incapable of safely parenting the Child. Likewise, Father's flippant attitude about substance abuse in the home inspires little confidence that this condition will be remedied at any point in the near future.

On appeal, Father argues that Tennessee Code Annotated section 36-1-113(g)(3) cannot apply to him because he was not residing full-time in the home on the day the Child was removed. Specifically, Father testified that when the Child was removed by DCS on April 5, 2019, Father was staying with his own mother due to a no-contact order that was in place as to Father and Mother. This argument, however, is unavailing. Tennessee Code Annotated section 36-1-113(g)(3)(A) explains that for persistent conditions to apply, the child must have been removed from "the home or the physical or legal custody of a parent[.]" Regardless of what exactly transpired on April 5, 2019, the Child was removed from Father's legal custody that day and was later adjudicated dependent and neglected. While Father may not have been present at the apartment at the precise moment the Child was removed,[5] the initial referral regarding the Child was received by DCS on March 13, 2019, after a fight between Mother and Father at the apartment. Consequently, Father's actions contributed to the removal of the Child. Contrary to Father's assertions, this case is distinguishable from those in which we have held persistent conditions to be inapplicable because the children were not under the parent's care or custody at the time of removal. *See, e.g.*, *In re Scarlett W.*, No. W2020-00999-COA-R3-PT, 2021 WL 144232, at *7 (Tenn. Ct. App. Jan. 15, 2021) (persistent conditions ground inapplicable when it was undisputed that children had not seen mother for two years prior to their removal from father's home and mother was already incarcerated by the time of removal).

The conditions underpinning the Child's removal from Father's custody still persist, and Father testified at trial that it might be a year before he is fully prepared to assume custody of the Child. *See In re Navada N.*, 498 S.W.3d at 605 (noting that the purpose of

---

[5] Further, Ms. Shaw testified that Father was present at the apartment on April 5, 2019 and was arrested that day after fighting with Mother and a neighbor.

the persistent conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child"). Consequently, continuation of the parent-child relationship in this case greatly diminishes the child's chances of early integration into a safe, stable, and permanent home. Clear and convincing evidence therefore supports termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

### e. Failure to manifest the ability and willingness to assume custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* (citing Tenn. Code Ann. § 36-1-113(g)(14)). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). As to the first element, our Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set forth in *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018). *See In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *13). That is, that the statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Here, the trial court found that Father failed to manifest both the willingness and the ability to assume custody of the Child, and we agree. First and foremost, Father ceased contact with the Child in October 2019, several months before the petition for termination was filed. The only explanation given by Father as to why he discontinued visitation was that he was wary of DCS and of being arrested. The record does not suggest that Father made phone calls, sent gifts, or took any other actions to stay in contact with the Child after he stopped visiting her. While Father claimed at trial that he loves the Child and wants to assume custody eventually, Father's lack of effort in maintaining a relationship with the

- 15 -

Child seriously undermines this claim. *See In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at \*10 (Tenn. Ct. App. Sept. 3, 2020) ("[W]hen evaluating willingness, we look for more than mere words." (citing *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at \*9 (Tenn. Ct. App. Apr. 17, 2019))); *see also In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019) (noting that a "lack of effort before the termination petition [is] filed undercuts any willingness argument"). Father's disinterest in maintaining his relationship with the Child, his failure to complete many of the tasks necessary to regain custody, and his pattern of blaming Mother entirely for the issues in their household all reflect an unwillingness to do what is required to assume custody of the Child.

For all of the reasons already discussed with regard to the other grounds for termination, we also have serious doubt that Father has the ability to safely parent the Child. *See In re Cynthia P.*, 2019 WL 1313237, at \*8 ("Ability focuses on the parent's lifestyle and circumstances." (citing *In re Maya R.*, 2018 WL 1629930, at \*7)). Father's current lifestyle and circumstances, particularly the substance abuse and violence in his home, pose a risk of substantial harm to the physical and psychological welfare of the Child.

Accordingly, we conclude that clear and convincing evidence supports termination of Father's parental rights to the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

### 2. Best Interest

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interest analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

We consider nine statutory factors when analyzing a child's best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such

duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

We note, however, that this list is non-exhaustive.[6] *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor

---

[6] The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i). *See* 2021 Tenn. Pub. Acts, ch. 190 § 1. This amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

In the present case, the trial court found, by clear and convincing evidence, that the best interest factors favor termination of Father's parental rights. Having thoroughly reviewed the record, we agree with this conclusion. Father has not meaningfully adjusted his circumstances, conduct, or conditions since the removal of the Child, insofar as Father's propensity for substance abuse, domestic violence, and incurring new criminal charges has not improved. *See* Tenn. Code Ann. § 36-1-113(i)(1), (7). By the time of trial, Father was in essentially the same position he was when the Child was removed from his custody over a year earlier, despite the reasonable efforts of DCS. *See id.* § 36-1-113(i)(2). This is perhaps most evidenced by the fact that Father was incarcerated at the time of trial and had recently pled guilty to two aggravated assault charges involving the Child's mother. *See id.* § 36-1-113(i)(1)–(2), (6)–(8). Father also took the position at trial that the Child's removal into DCS custody was Mother's fault, suggesting that Father cannot or will not accept responsibility for the circumstances and conditions necessitating the Child's removal. *See id.* § 36-1-113(i)(1), (8).

Weighing particularly heavily against Father is his inexplicable failure to see or speak to the Child after October 2019. Father has made little to no effort to maintain a relationship with the Child, and there is no evidence of a meaningful bond between she and Father. *See id.* § 36-1-113(i)(3),(4). Despite claiming to have had a license and a working vehicle during the custodial period, Father had not seen the Child in over six months by the time of trial. *See id.* In that vein, Father also paid only $141.90 in child support while the Child was in foster care, despite having claimed to Ms. Shaw that he was employed as a handyman and capable of earning up to $18.00 an hour. *See id.* § 36-1-113(i)(9). Moreover, Father testified at trial that he did not have trouble maintaining a place to live, a car, or a job during the custodial period and offered no explanation as to why he failed to pay full child support. *See id.*

Finally, both Ms. Shaw and Carla M. testified that the Child is happy and stable in her current placement. The Child has several brothers and sisters in her foster home, and by the time of trial, the Child had been with Carla M. and her family for over a year. Carla M.'s family wishes to adopt the Child if the opportunity arises. As such, a change in caretaker or in physical environment at this juncture would likely prove detrimental to the Child. *See id.* § 36-1-113(i)(5).

Based on the foregoing, we conclude that the trial court correctly found, by clear and convincing evidence, that termination of Father's parental rights is in the Child's best interest.

## V. CONCLUSION

The judgment of the Juvenile Court for Knox County is affirmed. Costs of this appeal are taxed to the appellant, Thomas N., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE